Our next case, Daugherty v. Ocwen Loan Servicing, Mr. Lynch. May it please the Court, my name is John Lynch and I'm representing the appellant, Ocwen Loan Servicing, and I'm reserving five minutes for rebuttal. I wanted to start out with what we're not appealing. We're not appealing the negligence finding for the $6,000 in emotional distress and attorney's fees. This appeal is about the willfulness finding and if the Court believes the willfulness finding should stand, which we would disagree with and hope that doesn't occur, a reduction in the punitive damages. So I'd like to start with focusing on the legal standard for willfulness. The legal standard for willfulness is either an intentional act or recklessness. Intentional act is not at issue in this case. This is a reckless finding that's undisputed by all the parties. So what's your argument now with respect to whether or not your client acted with objective reasonableness? We believe our client definitely had policies and procedures in place that were objectively reasonable under safe cap. But yet you concede liability on the negligence claim. We concede liability on the negligence claim. Okay. And I'll explain why. Under the Safeco test to find willfulness, you have to have an unjustifiable risk of violating the FCRA. And that has to be an objectively reasonable test that the Court is supposed to determine as a matter of law. Our policies and procedures in this case were reasonable. You heard the testimony in the record. It was clear that we investigate the dispute that is given by the Consumer Reporting Agency. We look at our own documents. We do an investigation, and we either verify, correct, or delete the information with respect to the dispute. Where the distinction in the two camps are here, in this case on whether our policy is objectively reasonable or not, is what you have to respond to. And I'm going to be using some terminology that's called the Automated Consumer Dispute Verification Form, which in the fair credit reporting world is called an ACDV. And under the Fair Credit Reporting Act, under the statute, you can have a direct dispute from the actual consumer. And there's no private right of action for that. Under B-2, there is a private right of action. And that's when you make a dispute to the Consumer Reporting Agency, and then that dispute is transmitted to what ACWIN is, a furnisher, in the form of an ACDV. A real easy example of the difference and why we think our policy is reasonable and why the other side is wrong, is there was a number of disputes in this case where the only dispute was not his, not hers. That happened for about a year. Counsel, can I, let me ask you a question, because this is something that is, I do understand your statutory argument, right? You're saying that what divides the camps is whether you had any obligation to investigate beyond what Equifax told you in its codes. Yes. Okay. What I don't understand is that is exactly what the judge instructed the jury. The judge gave the jury instructions that incorporate your reading of the statute. The reasonableness of ACWIN's investigation is measured by its response to the specific information provided by Equifax. That is, whether the investigation was reasonable is determined in light of what ACWIN learned about the dispute from Equifax's notice of dispute. That is your reading of the statute. So how is there a statute? You didn't object to those, I assume you wrote, you didn't instruct, you didn't object to those instructions. Not that instruction. Okay. So why is this statutory question in front of us? You won. Yeah. No. So on the 50B issue where we said willfulness could not be argued to the jury, that's where willfulness should have been struck. They were allowed to argue, Judge. The judge properly instructed the jury as to what will, as to what your obligation was under the statute and as to the definition of willfulness. So where is this, why is this like a safe-co problem? There doesn't seem to be a statutory question in front of us. Because you're looking at the evidence that was presented and the arguments made during closing. This was the argument they made over and over during closing. So you have an objection to the closing argument. That's what you should think about in this case. We do. We do. The evidence that was presented. Did you appeal the denial of your objection to the closing argument? We appealed the denial of our 50B motion and a motion for reconsideration. Neither of which, though, rested on this kind of statutory interpretation question you're pressing on us. We made the argument in a summary judgment motion, the 50B and the reconsideration. Do you understand? If the judge gave the instruction to the jury that you either asked for or acquiesced in, what's your argument on the willfulness error? The argument on the willfulness error is that when you look at the evidence, there's no clear and convincing evidence of willfulness. Okay. So it's not that there's a legal dispute in front of us. This isn't a safe-co case. Your argument is, yes, we got the instructions we wanted that outline our duty accurately, but there was not evidence in the record from which a reasonable jury could have returned a verdict under these instructions. Correct. But I do believe you have to look at the definition of recklessness for the clear and convincing standard because there was no evidence. Just to be clear now, you're not making a safe-co argument. I am making a safe-co argument. All right. So what is it? The safe-co argument, to be absolutely clear, is our policies and procedures were objectively reasonable, and there was no, as a matter of law, when you look at the recklessness issue at the evidence, there is no error. There's nobody from an objectively reasonable standard that could say this was an unjustifiable risk of violating the FCRA. And here's the example. In the ACDV that happened for like... Well, did the district court fail to give an instruction that you asked for? No, they did not. No, they did not. It's looking at the evidence as a whole. There was no evidence of willfulness. There's no clear and convincing evidence of willfulness. Wait a minute. You're conceding then that there's no legal error in the instructions, but the jury made an error? You're saying the evidence is insufficient as a matter of law. As a matter of law. The evidence is insufficient as a matter of law. We made that. Why couldn't the jury have just looked at Plaintiff's Exhibit 11 and concluded that Aukwin ignored the 007 code? That's an example of negligence, Justice Kagan. Why couldn't they have concluded that that was reckless because 007, according to the evidence, puts front and center. It's a red flag. Everything's disputed. You need a careful and thorough investigation. 007 just deals with three prongs. It's account as stated, payment ranking, and payment profile. I thought there was evidence in the case from their expert to the contrary that 007 put Aukwin on notice. That's not what the codes mean, and that's not what they said. Okay, but was that the evidence in the case? There was some evidence as to that, Justice Kagan. To be absolutely clear, when that issue, we believe, was negligence because we didn't respond to that code at all in March of 2013. We did respond to that code in two other occasions. Our policies and procedures were reasonable to respond to codes and investigate the disputes. What they claimed, their entire case was that we had an obligation to go beyond the dispute. And an example of that is the not his. The district court said, no, you don't. The whole thing is just what Aukwin learned about the dispute from Equifax's notice of dispute. So, again, I don't understand. It seems like that was a hotly contested issue, and then the district court ruled in your favor and instructed the jury. Whatever they're telling you, the reasonableness of the investigation, the scope of that is determined by the coding on these AC whatevers. ACDVs. And what they argued, for a year they were not his, not hers. We validated those and corrected the account every time. They argued, and their whole position in the case was that we had an obligation to go beyond the dispute to discover the duplicate trade lines. My apologies, but I'm confused between the argument as I understood it in your brief and what I'm hearing today. So I'm trying to get square away on this. So your argument now is that the closing arguments, the arguments of counsel violated the jury instructions? I'm arguing that and the evidence is insufficient as a matter of law. When you look at objective reasonableness. Wait a minute, wait a minute, wait a minute. So have you raised as error the opposing counsel's closing arguments? Have you raised that as a separate claim of error? We have not. I'm just using that as an example of the evidence that was presented. All right. The evidence as presented was we made a few errors. They did not have, here's the issue. They have no evidence that our policies and procedures raised an unjustifiable risk of violating the fair credit reporting act. There is some testimony that the 007 dispute code was a very broad dispute code for just about everything that has to do with the account. Isn't that what the witness said? And that it requires the investigator to be, have a really good agent to investigate all the factors that could be wrong with the account. And that's some testimony. Justice Kenyon, the first time the 007 was raised in March, we didn't respond to it. We only responded to the other code. Two other times before the lawsuit was filed on the 007 code, we responded and corrected 10 to 12 different things in the ACDV. I've got a list of them and we could go to the testimony on that. We corrected payment history. We corrected payment profile. We corrected the number of days late. It's 3469, which is our response to the ACDV. The two times that the 007 were raised after March of 2013, we fully responded and made corrections, but Equifax kept reporting the wrong information. That's negligence. That shows that we responded to 007 and corrected 12 to 13 criteria on the ACDV. I do admit, in March of 2013, when it was an 01 and an 07, we didn't correct it one time. The next two times before the lawsuit was filed, we corrected, made 11 corrections. And as a matter of law, that can't be an unjustifiable risk of violating the FCRA, because we had policies and procedures in place to make those changes, which are demonstrated in our actual reporting in this case. So we have testimony from our rep. I don't want your time to expire without you having time to address the size of the punitive damages. The size of the punitive damages, we hope this case, you strike the willfulness because there's not that evidence. But on the size of this, it's 408 to 1. There has never been a Fair Credit Reporting Act case that we've ever seen with a standard greater than 80 to 1. That was the Saunders BB&T case in this court. Okay, but was that really 80 to 1 in Saunders? Because the compensatory damages were 0. I think they were 1,000. No, they were 0. They were 0 compensatory. And there was a statutory damage imposed. Correct. But when it's 80 to 0, what's the ratio mathematically? Yeah, exactly. That's 80 or nothing, yeah. And if you read that opinion, my reading of that was Judge Motz agreed that the ratio was too high, but $80,000 wasn't that significant of an amount. If you looked at the Saunders v. BB&T case, there was intentional conduct in that case. The intentional conduct was not putting a dispute code on the ACDVs. We put a dispute code on every single ACDV. This is an alleged reckless conduct. Can I ask a question about the size of the award? What role do you think the statutory authorization for punitives plays in this case? Because as Judge Keenan pointed out, this is an unusual statute in that it says you can get punitive damages even if you have no compensatory damages. Do we owe some deference to that legislative assessment? No, I think you read the statute as written, and I think you have to look, and there's no deference to it at all. You still have to look at the constitutional standard under State Farm. There was no economic harm at all in this case. That was struck at the Rule 50 motion. You're talking about emotional distress. The only factor was financial vulnerability, which would be present in every consumer case. Now, we did say in Saunders that we do owe some deference to the kind of legislative judgment about punitives that's embodied in this statute, right? It's authorized, yes. Yeah, and that we should sort of pay attention to that in thinking about what counts as excessive because here we have Congress basically saying we get that there are going to be a lot of cases with either very low damages or even zero damages, and we want to authorize punitives anyway. Punitives are authorized with zero compensatory damages. Well, that's unusual. That's unusual, but you still – Doesn't it sort of take us out of the whole ratio question? I don't think it takes you out of the ratio question at all. I think it's where it's – because it's a constitutional issue under State Farm. Right, but State Farm does say when compensatory damages are very low, the ratio thing becomes certainly less significant. And when compensatories can be zero and you can still get punitives, as Judge Keenan pointed out, I mean, I'm not sure we can even think in terms of ratios anymore. But if you look at the harm here, which is economic, which is just loss of sleep, not even seeing a doctor or any harm, and you're talking about no credit denials at all. I do a lot of Fair Credit Reporting Act work. This is the lowest, smallest amount. Tell us what you think the standards should be. What should have guided the district court's instructions in terms of a punitive standard? The court should look at the harm, which was very minimal, should look at the ratio and look at the State Farm constitutional, look at the various factors that are given, and also look at what's a fair number when looking at other Fair Credit Reporting Act cases. What would that be? That would be the Saunders case. The Saunders case where zero compensatory damages had 80,000, and there was an analysis of the ratios in Saunders. And what they said in Saunders is we're not going to consider that because $80,000 is such a low amount. What about the reference in TXO to potential harm? Yes, to what extent does that play into the analysis here? This guy was in danger of losing. I mean, we're talking about a person's limited economic status. He was a retired firefighter, wasn't he? Yes. And he was worried about losing his home. And Safeco tells us to look at potential harm. So how does that factor into this? So the potential harm, I think, is really important. Since we put the XB code, because Saunders told Ocwen to do that by the Fourth Circuit case, we put it on there, which did not affect his credit score. His credit score was actually higher than Experian. So in this case, where you had the credit reporting, it did not result in any type of credit denials. It did not affect his life and his ability to stay in the house whatsoever. So you're saying there was no potential harm? When you put the XB code, and that was the point of the Saunders case with the dispute, when you put a dispute code on there, which we did, and that's where Saunders found the intentional, it takes away that potential harm because you're marking the account as disputed. And that's important because it tells creditors or anyone else that's looking at it that there is a dispute. I may be misremembering. I had thought that there was testimony that the plaintiff was trying to refinance this balloon payment and was unable to do that because of the problems he was having with his credit report. Yeah, and what the court ruled on that is there were so many other errors and derogatory issues in his credit report that there was no causation on the mistakes here. And since there was no causation at all, she struck, the district court struck the economic component, which would have been the credit denial. So the economic component got struck at the Rule 50 stage, and the only thing that was allowed to go forward was the emotional distress. So the potential harm, when you put an XB code in saying it's disputed, the Equifax was the guilty party here. We followed reasonable procedures, made a couple mistakes. Thank you very much, Counsel. Thank you. You've reserved some time in rebuttal. Ms. Bloom-Katz. Good morning, Your Honors, and may it please the Court. I'd like to start with my colleague's concession here that Ocwen was certainly negligent in its conduct. Well, that was a question for the jury, whether there was just a mistake here or there, or whether there was a continuous pattern of conduct that showed willfulness and willfully turning a blind eye to both the dispute codes, which they concede they need to look at, and also all the other information that Ocwen had in its possession from the many disputes from Mr. Doherty himself. He sent in exhibits with circles and arrows showing exactly what was wrong. The CFPB was involved in telling Ocwen what was wrong here, despite the decodes. What do you say that they were told was wrong that they didn't check out? Well, if we just look at the 007 dispute codes, as Judge Keenan was focusing on earlier, Ocwen would receive these ACDVs, which would include information showing that Mr. Doherty was in arrears, that he was in foreclosure, that he was five months behind. It would have all of this information that all parties agree is false. So what they did. So what Ocwen would do in the transaction logs from the employees in their investigation shows this, that they would just check to see that the account belonged to Mr. Doherty, so they'd do a check of the Social Security number, and then they would mark the top of the ACDV, verified as reported, and send it back to Equifax. And you can see that if you look at that first ACDV in this case, that's in your record appendix at 1092. They're verifying this false information and sending it back. And my colleague likes to make this out to be an aberration, but it's not an aberration. It happened over and over again, actually through the whole course of this 17-month period where Mr. Doherty was trying to get these inaccurate things on his credit report fixed so, as Judge Harris mentioned, he could refinance. So even if you look at the last ACDV in this case, that's in August of 2014, after the lawsuit has been filed here, after the CFPB's investigation, after all these telephone calls and dispute letters, after everything that Mr. Doherty has done to put Ocwen in note. So the ACDV things you're talking about, they contain the information from Equifax was not just, is this the account? Is this account correct? Right. According to your records. Yes, and that's what the jury heard evidence of and the jury saw the ACDVs as well. And the ACDVs have, if you look even at that first one at 1092, they have several fields in them. And so you can see that the ACDV directly says that Mr. Doherty is in foreclosure, even though he's not. It shows that he's $6,000 in arrears. He's not. It shows that he's behind. He's not. And then you can see at the top of the page, even when the 007 dispute is there, whereas Judge Keenan recognized the jury heard evidence that this was a broad code, that they needed to investigate all of these things, Ocwen would mark that verified as reported. There's some different language. Sometimes it's like accurate as reported, but essentially confirming all of that information and sending it back to Equifax. And it did that time and time again. And that's both what the jury heard and what the district court, who presided over this trial for six days, heard, that there was this continuous pattern. And not only did Ocwen have this continuous pattern when the 007 codes were in, but also when there were other codes there as well, it would just be blind to all of the information in its possession. So what codes were there other than the 01 and the 07? Those were the only two codes, Your Honor. I don't know that the court – The 01 would have been, does this account belong to this guy? The other one was, is this information that's showing up here correct? That's essentially correct. But even with the 001 code, and I don't think the court needs to get there because there's enough on the 007 code itself to show willfulness and how these practices were reckless. But even on the 001 code, all the circuit courts that have reached this question say that the furnisher, Ocwen, can't turn a blind eye to the information in its possession showing what the dispute is about. Why is Mr. Doherty saying that this account is not attributable to him, that it's not his? He's saying, I don't have an account in foreclosure. I just liquidated my wife's retirement so I could avoid the foreclosure and get out of it. Why is it saying that? But if the credit reporting agency only asks, does this account belong to this individual, what under the statute requires them to do anything more than that? Well, the statutory language is about there being a reasonable investigation into the dispute. And as the Eleventh Circuit and the Ninth Circuit and this court has said, you can't just cabin that in a very narrow way. It has to be a reasonable investigation, a searching investigation. But if the credit reporting agency only says the disputed information is with regard to who owns the account, why would they need to do anything else? Well, even talking about who owns the account is sometimes a very difficult question to figure out what that means. Is somebody saying that there's mistaken identity? Is there fraud? Is there any of these things? The answer for the 07, it would be different. But on the 01, if all the Equifax says, does this account belong to Mr. Doherty? And it does. It seems like that's the end of it. Well, first of all, I think that this can rest perfectly fine on the 07 code. Doesn't it have to? Because this seems like a really interesting statutory construction question, but the district court instructions, I mean, ruled against you. It said, a reasonable invest, OCWIN is required to conduct a reasonable investigation into the information identified as disputed on the ACDV received from a consumer reporting agency. Right, and that's exactly what the jury found. I think it's just I can highlight the other case law from other circuits showing that a reasonable investigation, you can't turn a blind eye and look and truncate your investigation just to what the ACDV, that code. But again, in this case, we don't even need to go there because there's enough of a continuous pattern of brushing off these disputes, even as they have that 007 code, and as Judge Keenan recognized, there was ample evidence in the record for the jury to understand that that really put OCWIN on notice from the 07 code, that they needed to investigate all of these different things, that they were turning a blind eye to because over and over again, they just did a very perfunctory cursory investigation. And just, I know it's a big record, but just remind me, so your colleague says, well, even as to the 007 codes, at least twice we did make some corrections. Yes, Your Honor, but there are attempts at modification with those 07 codes, actually just highlight how insufficient those investigations were. So the first one, I believe, was in April 2014, for example. OCWIN again receives an ACDV with this 007 code. The ACDV shows that Mr. Doherty falsely is in arrears, is in foreclosure, five months behind, other negative information. The only part that they change there is to show that he's current. They don't change the fact that he's in foreclosure. They don't change the fact that he's five months behind. I mean, it doesn't even really make a lot of sense. Like, how can he be current and five months behind? And it's also really that foreclosure notification that really makes a big difference on whether he can refinance. As you mentioned, Judge Harris, Mr. Doherty was facing this balloon payment on his loan. He needed to refinance in order to save his house. There's evidence in the record showing that particularly this foreclosure notification was making it impossible for him to refinance. So he was doing everything he could to try and get that off his credit report. He even asked ACWIN, don't fix my credit, just give me a letter I can show a lender showing that I'm not in foreclosure. ACWIN wouldn't do it. And I should just clarify the record from something that my colleague said. The district court didn't rule that there could be no economic damages here because there was so much other bad stuff in his credit that he would never be able to get another loan. The district court's reasoning for not letting economic damages go to the jury was because there wasn't evidence of the difference of how good a loan would be, what the economic difference would be if he could have gotten a loan beforehand versus what the quality of that loan would be later with this stuff not on his record. And you can see that in the district court's decision on summary judgment. She explains that it's not because there's no information that there's nothing in this that was really harmful to this majority. How many 007 codes did ACWIN get that you say they didn't handle properly? In total, ACWIN received eight of these 007 codes over the 17-month period. Four of them were clearly on the trade line that was giving them wrong information. Also sort of underscoring how perfunctory these investigations were, ACWIN would- How many of those seven? How many did they respond to incorrectly? They responded to all four of the ACDVs that showed the negative information that he was in arrears and foreclosure and behind. They responded to all four of those incorrectly. That first one in March 2013 where they just totally disregarded it. We talked about the ones that they attempted to modify and there was insufficient modification still leaving the notations that he was in foreclosure. And the second one, they also still left the notation that he was months behind due. And then the last one that I mentioned, the end of this case, even after the lawsuit was filed, they were still confirming with these 007 code ACDVs, still saying that Mr. Daugherty was in arrears and in foreclosure and months behind. So that's four of seven that they messed up. Well, the other ACDVs that had the 007 codes coming in were on the trade line that didn't show Mr. Daugherty in arrears. So what ended up, what happened in this case, and I actually think this underscores how perfunctory their investigations were, is ACWIN was receiving- Nobody ever told them there were two trade lines, right? Can you say that again? Nobody ever told them that there were two trade lines. No one ever told them explicitly there were two trade lines, but it was certainly within the province of the jury for them to think if there was a reasonable investigation into what was going on, that ACWIN would have discovered that. And actually, even regardless of whether they discover the duplicate trade line or not, ACWIN has an independent obligation under the FCRA to conduct a reasonable investigation and to correct any inaccuracies that it finds. Well, it sounds like- No, go ahead. No, you go ahead. No, you see, it sounds like you got three of these ACDVs that protested a credit score that was correct, and you had four that were incorrect, and they didn't respond to appropriately. Is that correct? That's correct. I think they came in pairs, so there were four on the incorrect trade line and four on the correct trade line. So at the bottom line, is it these four ACDVs that entitles them to judgment? Well, I think those four ACDVs are also indicative of a greater problem. First of all, they're very harmful and show the reasonable investigation of ACWIN. But it also is- Okay, wait a minute. Sorry, excuse me. How many of these ACDVs were there altogether? There were 24, Your Honor. All right. So of the 24, they messed up four. That's only if you're looking at the 07 ones. And again, I think there's quite a lot of problem with the 07 ones, but I also think what happens in the other ACDVs showed the jury, and the jury was welcome to find, that there was a greater problem in how ACWIN was investigating these disputes, given all of the notice that it was on about what was wrong. Mr. Doherty- We've got a huge issue in this case, and that is the size of the punitive damages award, and you're running out of time. I'm sorry. Well, let me address the punitive damages award, and I would like to particularly address the Saunders issue in the Saunders case. And that case is important because it really does minimize the importance, the reliance on the ratio in this area. In the Saunders case, for example, cited affirmatively the 11th Circuit case in Kemp that had a 1 to 2,000 ratio. And as Judge Harris mentioned, Saunders starts with the intent of Congress and the statutory scheme here. Congress recognized that compensatory damages in this area were going to be really low. Statutory damages are only $100 to $1,000. There's really unlikely to be any physical injury. What happens to the jury's discretion here? Whether or not it's a ratio or not, 408 to 1 seems pretty hefty to me, but what if they awarded 5 million? Well, I think- What's the limiting principle? Yeah. How do we know what parameters there are on it? Well, I think it's difficult to know because you have to look at the facts and circumstances of every case. But here, one of the main things that the district court relied on, the district court, again, having sat through the evidence for six days and really being close to the record, one of the things that she relied on was the fact that the jury was justified in thinking a substantial award was necessary to deter and punish Ocwen and to make sure that it wouldn't continue this practice again, that it wouldn't put other homeowners through this same gauntlet that Mr. Doherty had to go through. I don't remember anything in particular there. I thought there was a request or some discussion of 280,000 at some point. As the record shows, Your Honor, in the punitive damages closing argument, counsel for Mr. Doherty gave the jury several benchmarks just so that they could get a sense of what- Those were? And the benchmarks were that one-tenth of one percent of Ocwen Financial Corporation's cash on hands would be 280,000, and they also gave the benchmark that one percent of that cash on hand would be 2.8 million. So the jury was hearing just different benchmarks to get a sense. What authorized the jury to be given the information from the parent corporation, which the 10-K shows has multiple subsidiaries, and take that as the worth of the defendant? Well, first, just to clarify the record, Your Honor, Ocwen never objected to the relevancy of those 10-K documents. And what made it permissible for Mr. Doherty to admit that evidence was actually Ocwen's own misconduct, and that's what the district court explained, that Ocwen was asked to produce evidence of its financial net worth in discovery and didn't. Then Ocwen was told- Did you file a motion to compel? I don't think there was a motion to compel, but following up on that, Mr. Doherty told Ocwen that it was planning to call Ocwen's corporate representative in the punitive damages phase if the jury returned a verdict of willfulness. And then the district court also didn't excuse the corporate representative from trial, yet still Ocwen didn't make her available to testify during the punitive damages phase. Was that a drastic remedy, though? I mean, wouldn't-it seems to me a middle ground beat is to simply continue the case until the next day, tell Ocwen to get its representative back, and impose whatever sanctions on Ocwen for its failure to allow its witness to leave court rather than to present a whole different quantum of evidence than ordinarily would have been presented. Well, I think given the circumstances, it was well within the district court's discretion to want to continue with the trial then. Given that this evidence was relevant, that Ocwen never contended that this was more prejudicial than probative- It was relevant about taking the financial status of the parent to be the financial status of a subsidiary that's only one of a multitude of subsidiaries of the parent. Well, here the parent company in particular, as the district court recognized- And that's not the defendant. Right, but they were the sole owner, the sole shareholder of Ocwen. Well, how closely do they track in assets, the parent and the child? The answer to that isn't in the record, Your Honor. But one thing, if Ocwen felt like this was an unfair representation or not a good portrayal to the jury of its net worth, it was certainly available and had the opportunity to put in information about its own net worth. It could explain what would be enough to deter the company or not. Okay, let me ask you another question if I could. Let's say you're writing the opinion of this court on punitive damages, because this is what I'm particularly struggling with. What do you write as the standard to review the award of damages in this kind of case? I know you're arguing Saunders, and Saunders is suggesting there is a congressional intent not to adhere with excessive fealty to these other cases and different kinds of cases on ratios. But what do you write as the opinion of this court for what we have to look at in reviewing this punitive award? Yeah, I think what you write is that the cornerstone of punitive damages are two things. One, reprehensibility, and the second, the need to deter and punish a corporation, especially a corporation that's keeping saying that it did nothing wrong, that it's going to continue this practice. You're saying our opinion, if you don't mind my cutting you off just because we're good friends. Yeah, I understand that. So you're saying that we should say that there is no place for applications of ratios in cases of this nature. That's what you're asking us? Certainly minimal importance on the ratio, and that indeed is what Saunders said. It said, quote, it would not rely on the challenged ratio to foreclose the punitive damages award. I think that's already established in Saunders. Right, and in measuring the appropriateness of the award. I think you're looking at qualitative factors rather than any mathematical formula, and looking at reprehensibility, and you're looking at deterrence. Thank you very much, Your Honor. Thank you very much, Mr. Lynch. You've got some rebuttal time. I'll make it fast. I want to talk about those four ACDVs, just so it's clear. There were eight ACDVs on the duplicate trade line, the one that was improper. Only four of those had the 007 code. The first one, in March of 2013, we didn't respond to. We didn't verify it as true. We didn't respond to. We missed it. That was a mistake. April and June of 2014, we responded completely. Made 11 changes in June and 9 or 10 changes in April on the exact categories of the 007. It was payment history, payment profile, and payment ranking. Did it still show them in foreclosure? It did, and let me explain that. In the April ACDV, foreclosure was noted. We made a bunch of other changes. Didn't change the foreclosure because that's not the code. There's a different way to dispute foreclosure. In the June ACDV, foreclosure wasn't even listed because probably when we made the payment history changes, foreclosure came off. Then the fourth ACDV with 007, after the lawsuit was filed, wasn't responded to because everything was being changed. When you look at it from clear and convincing evidence of an unjustifiable risk of violating the FCRA, we didn't respond one time. We responded fully in April and June. We had policies and procedures to respond, and we did respond, and Equifax didn't make the changes. They did not make those changes. Counsel, when they're talking about the not his, not hers, all the other ACDVs, the statute and the Johnson case in this court are clear. You only have to respond to the dispute. That's the congressional makeup because they want responses to these ACDVs within a month. They want it done quick. You only have to respond to the dispute. You do not have to look at everything that's being reported. You just have to respond to the dispute. And making a couple mistakes is not clear and convincing evidence of an unjustifiable risk of violating the FCRA. When we didn't respond essentially just to one ACDV in March of 2013, and two times within the six months of the lawsuit being filed, we responded fully making 11 or 12 changes. The expert for the plaintiff in the record said you made a lot of changes. You did really good on that. The expert's opinion was based on the not his, not hers. And when they talk about the pattern in practice for a year, they're talking about a year of the not his, not hers. We had no obligation to make all of those corrections. All right. So tell us about opposing counsel says it's your fault that the evidence with respect to the parent corporation came into the record on punitive damages. Here's what happened. They didn't secure their net worth evidence in the case. Every case you have that has a net worth obligation, you have an obligation to go get testimony and go get documents. They didn't do either in this case. Well, they tried to get evidence in discovery, didn't they? They filed it, and we objected to it, and they never moved to compel, and they asked for things that were way too broad. They never approached us about a stipulation in net worth. They never got the documents, and they never took a 30B6 to get what they did was, because I don't think they were expecting a willfulness finding. They never secured the evidence. Then what they do over the weekend is pull out the 10K of the parent corporation. Our corporation is two levels below that. We object, and the judge didn't do anything and allow them to make misrepresentations. You didn't object until after trial, though, did you? We objected that it wasn't a disclosed document, and we did object, Justice Kennedy. When did you do that? It's in the record. Was it during trial? It was during trial. It was on that day. It was on the day of the punitive damage hearing. Right. You said it wasn't a disclosed document. Ever. Clarify for me, because I'm not sure. As I remember, you didn't object on the grounds that it was the information of the parent corporation until after trial. Is that correct? Yes. And what happened, Justice? Is that correct? That is true, and let me tell you why. What happened was we objected that it wasn't a disclosed document. It was never on any pretrial document list at all. The judge gave us five minutes to look at it, five minutes, and just continued the trial and kept going. And then we objected to it, and the misrepresentations during closing, which we did object to, when they were saying these are the financials of this defendant, they brought back a punitive award based on the financial information of our parent company, which is two layers above us, and we did object and file a motion. All right. Anything else? Equifax, when you look at punitive damages under Saunders, the court did look at the reprehensibility factors. This isn't a willfulness case in our view, but if the court gets there, Equifax was the wrongdoer. It was a duplicate trade line, and we corrected the 007 twice, made a mistake in March, and that's it. If you look at the reprehensibility, this is not a willfulness case. All right. Thank you very much. We're going to come down and recounsel and take a very short recess. This honorable court will take a brief recess.
judges: G. Steven Agee, Barbara Milano Keenan, Pamela A. Harris